Clara Kaufman v. Commissioner.
Kaufman v. Commissioner
Docket No. 507.
United States Tax Court
1944 Tax Ct. Memo LEXIS 317; 3 T.C.M. (CCH) 272; T.C.M. (RIA) 46161; March 24, 1944
*317 Otto J. Kraemer, Esq., 610 American Bank Bldg., Portland, Ore., for the petitioner. E. A. Tonjes, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: The present proceeding involves income taxes for the calendar year 1940. The Commissioner determined a deficiency in the amount of $103.52. The petitioner urges error as to the disallowance by the Commissioner of a deduction in the amount of $9,000.00 taken by the petitioner as a bad debt, representing certain loans or advances made by the petitioner to her son. The question presented is whether the loans made by the petitioner to her son in 1929 became worthless during the taxable year 1940, within the meaning of section 23 (k) (1) of the Internal Revenue Code, as amended by section 124 of the Revenue Act of 1942. Findings of Fact Petitioner's income tax return was filed with the collector of internal revenue for the district of Oregon. The petitioner is an individual residing in Portland, Oregon. On October 7, 1929, she borrowed the sum of $18,000 from the First National Bank of Portland (hereinafter sometimes referred to as the National Bank) and gave her note payable in 90 days as evidence *318 of such loan. On or about this same day; she loaned the entire $18,000 to her son, Leonard I. Kaufman (hereinafter sometimes referred to as Leonard), who was then 34 years old, to assist him in going into the restaurant and cigar business. When this loan was made, Leonard had only two or three hundred dollars of his own money. He gave the petitioner an unsecured promissory note dated October 7, 1929, according to the terms of which he promised to pay to the order of Clara Kaufman the sum of $18,000 with interest at 6 per cent per annum. No date of payment was named in the note, and there was never any definite understanding between Leonard and the petitioner as to when the principal was to be paid in full. It was informally understood that Leonard would pay two or three hundred dollars monthly and that the interest at least would be paid every six months or a year. The date on the note was changed in 1936 by Leonard at the petitioner's request from October 7, 1929, to October 7, 1936. This was done with intent to renew the note. The National Bank renewed the petitioner's note approximately every three months and on November 14, 1931, the principal due on the note still being $18,000, *319 she paid the note in full with funds which she had borrowed from P. Feldman on the same day. Feldman transferred petitioner's debt to the Mount Hood Soap Co., a corporation of which he was an officer. The petitioner discharged her obligation to the Mount Hood Soap Co. on November 2, 1939, with funds which she had borrowed from Henriette Senders. At the time of the trial of this case, the petitioner's indebtedness to Senders was still outstanding in the principal sum of $18,000, and petitioner was paying interest on that indebtedness. Within a week or ten days after receiving the $18,000, Leonard purchased 30 shares of National City Bank stock at a cost of $540 per share, or at a total cost of $16,200. He kept the stock for a year or two and then sold it, sustaining a loss of approximately $15,000. No part of the $18,000 was ever invested in Leonard's business. These facts as to the disposition of the $18,000 were not known to the petitioner until a few months after March 26, 1940, when Leonard filed a voluntary petition in bankruptcy in the District Court of the United States for the District of Oregon. Leonard obtained his discharge in the bankruptcy proceedings on November 20, *320 1940. The petitioner was listed in the bankruptcy petition as an unsecured creditor in the sum of $18,925, which included the $18,000 originally loaned to Leonard on October 7, 1929. After payment of expenses, there remained in the trustee's hands the sum of $153.69, all of which was paid to preferred and priority creditors. The petitioner has never received any payment on account of either principal or interest on this indebtedness of $18,000, either as a result of the bankruptcy proceedings or otherwise. The petitioner requested Leonard to pay both interest and principal on many occasions. The first of these requests was made within six months or a year after the loan was made. Similar requests were made on her behalf both by her brother, who managed her financial affairs, and by her attorney. Leonard refused to permit petitioner's brother to examine his books, and his response to all these requests was substantially the same, namely, that the money was needed in his business, that he could not afford to make any payments at the particular time, that he would start making payments as soon as business got better, and that he would never take advantage of the petitioner. Petitioner *321 even threatened to sue her son, but never in fact instituted proceedings. In 1937, Leonard represented to the petitioner that his business property required renovating and remodeling and that if she would help him obtain the loan of additional sums of money by endorsing his note, it would enable him eventually to repay her the $18,000. The petitioner accordingly signed a promissory note dated December 4, 1937, in the sum of $2,299.59 payable to the order of the United States National Bank of Portland (hereinafter sometimes referred to as the United States Bank). This note was payable in monthly installments of $63.88. Commencing with January 1938, Leonard made monthly payments in the amount of $63.88 to the United States Bank on account of this note. These monthly payments continued through March 1940. No payment was made in either April, May, or June 1939. However, two payments, each in the amount of $63.88, were made in July 1939. Additional payments in the amount of $63.88 were made by Leonard in August and September 1939, and payments in the amount of $30 each were made monthly from October 1939 through March 1940. The amount due on this note on January 1, 1939 was $1,533.03. *322 By paying the sum of $537.16 during 1939, Leonard reduced the amount of this indebtedness to $995.87 as of January 1, 1940. On August 8, 1939, petitioner signed with her son, Leonard, a note in the principal sum of $3,600, payable to the order of the United States Bank, and bearing 6 per cent interest per annum. Leonard paid interest on the $3,600 note during 1939 in the following amounts: $19.50 on September 7, 1939, $19.02 on October 7, 1939, $17.71 on November 7, 1939, and $16.98 on December 5, 1939. In 1940, he made two additional interest payments, one on January 8, 1940 in the amount of $20.26 and one on February 23, 1940 in the amount of $26.91. He also paid $120 on account of principal in September 1939 and $60 monthly from October 1939 through February 1940. Both the note dated December 4, 1937, and the one dated August 8, 1939, were renewed on March 27, 1940, the day after Leonard filed his voluntary petition in bankruptcy. After Leonard used the borrowed $18,000 to purchase the bank stock, he borrowed additional money from other sources and together with a partner opened a lunch counter on Oak Street in Portland, Oregon, in December 1929. Leonard bought out this partner *323 about a year later, and thereafter conducted the business himself. In addition to the Oak Street store, he operated a cigar counter in a hotel and a third place of business in the Medical-Dental Building. He was actively engaged in at least two of these three businesses from 1929 until a short time before he went into bankruptcy. His monthly income for the first few years after 1929 was about $250 per month. He was married and had two children. Leonard's main source of income from about 1923 until about six or eight months before March 1940 was derived from still another business, from which he received approximately $600 a month in addition to his other revenue. In 1936 or 1937, he purchased a home, and part of his income was allocated to paying off the mortgage on that home, which he subsequently lost. The other business and the $600 a month income derived therefrom came to an end sometime in 1939. After his main source of revenue was thus cut off, Leonard was forced to borrow more money from outside sources. The United States Bank was demanding payment of its loan and Leonard had to purchase more stock to supplement the stock already pledged to the United States Bank. Although *324 Leonard has never been financially able to repay the sum of $18,000 which he borrowed from the petitioner, he was nevertheless financially able to make some payment on account of his indebtedness to petitioner up until the time he was adjudicated a bankrupt in March 1940. His debt to the petitioner became worthless in 1940. Opinion The petitioner contends that she is entitled to deduct the sum of $9,000 as a bad debt in connection with her income tax liability for the calendar year 1940. Her right to do so is governed by section 23 (k) (1) of the Internal Revenue Code, as amended by section 124 of the Revenue Act of 1942. [1] This amendment, which is made effective with respect to taxable years beginning after December 31, 1938, eliminates the necessity of an ascertainment of worthlessness and an actual charge-off by the taxpayer formerly required by section 23 (k) (1) of the Internal Revenue Code prior to its amendment, and substitutes actual worthlessness of debt as the test of deduction. Edward G. Janeway, 2 T.C. 197, 200, 201. Under section 23 (k) (1) of the Internal Revenue Code, as amended, the burden of proof is upon the taxpayer to prove that *325 the debt became worthless within the year 1940. "It would appear, as pointed out by the Court in Dunbar v. Commissioner, 7 Cir., 119 Fed. (2d) 367, 369, 135 A.L.R. 1424, that 'As a part of his burden in demonstrating that it became worthless in [the year of the claimed deduction] he must of necessity show that it had some intrinsic or potential value at the close of [the preceding year].'" San Joaquin Brick Co. v. Commissioner (C.C.A., 9th Cir.), 130 Fed. (2d) 220. The San Joaquin Brick Co. case involved a deduction for worthless stock which, under section 23 (e) of the Internal Revenue Code, must be taken in the year in which the loss is sustained by reason of the stock actually becoming worthless; but since the amendment of section 23 (k) (1) of the * Internal Revenue Code by section 124 of the Revenue Act of 1942, the considerations underlying the determination in the San Joaquin Brick Co. case are equally applicable to a determination under section 23 (k) (1). See also, Estate of Harris * Fahnestock, 2 T.C. 756. *326 Any application of the rule expressed in the San Joaquin Brick Co. case must take into consideration the oft-quoted rule of the law of taxation enunciated by the Supreme Court in the case of Lucas v. American Code Co., Inc., 280 U.S. 445, that: "The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal test." The court in the Dunbar case, supra, in deciding the same question as that involved in the San Joaquin Brick Co. case, stated at page 370, that the taxpayer "should not be penalized by any technical application of hard and fast rules in the assumption of the burden cast upon him to establish the precise time in which the loss occurred. It is a difficult burden at the best and, in the consideration of whether it has been met, he is entitled to that common sense, practical test suggested by the Supreme Court in Lucas v. American Code Co., supra." We apply such test to the facts here found. It is the duty of this Court to decide the question of fact involved. Lauriston Inv. Co. v. Commissioner, (C.C.A., 9th Cir.), 89 Fed. (2d) 327; *327 Continental Pipe Mfg. Co. v Poe, 59 Fed. (2d) 694. The evidence establishes that until some undisclosed time toward the end of 1939, the debtor had a monthly income of approximately $850. Even after the major part of that income was cut off, he had a monthly income of $250 until a short time before he went into bankruptcy in March 1940. During 1939, he made payments in the amount of $910.37 on an average indebtedness (excluding that to petitioner) of $4,714.45. If the debtor had paid petitioner $910.37 in 1939, petitioner would have received 10.1 per cent on the amount of indebtedness ($9,000), which she is here claiming as a deduction. If the debtor had divided the $910.37 in proportion to the amounts he owed to each of the payees of the three notes, petitioner would have received 66 per cent of the $910.37 or $600.84, which would amount to 6 2/3 per cent on the indebtedness ($9.000) which she is asserting. During the first three months of 1940, the debtor paid $257.17 on an average indebtedness (excluding that to petitioner) of $4,130.87. If the debtor had paid petitioner this $257.17 in 1940, petitioner would have received 6.2 per cent on her indebtedness *328 for the first three months of 1940. If the $257.17 was distributed on a proportionate basis, petitioner would have received 68.5 per cent of the $257.17, or $176.16, which would amount to 2 per cent on her indebtedness for the first three months of 1940. Having in mind the practical test which the courts have repeatedly held is to be applied in these cases so that the taxpayer will not be put in the position of picking at his peril a particular tax year in which to claim this kind of a deduction, we are of the opinion that the debt here in question had intrinsic value as of December 31, 1939. "* * * a debt cannot be written off as worthless merely because it is doubtful." American Trust Co. v. Commissioner, (C.C.A., 9th Cir.), 31 Fed. (2d) 47, 49. We are interested not in the debtor's willingness to pay the petitioner, but rather in his ability to do so. We are of the opinion that the evidence establishes that the debtor's ability to pay some part of this indebtedness continued until the bankruptcy proceedings in 1940. Although the filing of a petition in bankruptcy is not sufficient in itself to establish that a debt became worthless, American Trust Co., 21 B.T.A. 30, 32, *329 it is nevertheless "an element to be considered in connection with the determination of the value of the debt." Patten & Davies Lumber Co. v. Commissioner, (C.C.A., 9th Cir.), 45 Fed. (2d) 556, 558. Regulations 103, sec. 19.23 (k)-1 (b), both before and after the amendment made by T.D. 5234, 1943, I.R.B.-5, p. 11, provide that "Bankruptcy is generally an indication of the worthlessness of at least a part of an unsecured and unpreferred debt." The bankruptcy proceedings in the instant case are an identifiable event which affirms this Court's objective conclusion based upon all the evidence, that the debt here in question became worthless in 1940. See United States v. S.S. White Dental Mfg. Co. of Pennsylvania, 274 U.S. 398. Decision will be entered for the petitioner. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part which becomes worthless within the taxable year, as a deduction. * * *↩